UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT

3:19mJ 1300 RWR

ss: Hartford, August 13, 2019

COUNTY OF HARTFORD

AFFIDAVIT

I, Jeffrey Moody, a Special Deputy United States Marshal, having been duly sworn, do hereby state:

## I.    INTRODUCTION

1.    I am a Detective with the Hartford Police Department and have been employed as a Hartford Police Officer since 2005.  My responsibilities include investigating and enforcing all city and state criminal laws.  I am also currently assigned to the FBI's Northern Connecticut Violent Crimes Gang Task Force ("NCVCGTF"), which is an FBI sponsored Task Force consisting of law enforcement agents from the FBI, the Hartford Police Department, the Connecticut State Police, and the Connecticut Department of Corrections. The NCVCGTF task force is dedicated to combating violent crime and firearms and narcotics violations affecting the City of Hartford, and the surrounding communities.  As a member of the NCVCGTF, I have been duly deputized as a Special Deputy United States Marshal and FBI Task Force Officer, which authorizes me to investigate violations of federal criminal law.

2.    I attended the Hartford Police Academy in Hartford, Connecticut, where I received law enforcement training, to include firearms training, the execution of search and seizure warrants, investigative techniques, and legal instruction, which covered Fourth Amendment searches and seizures. I have written and executed search warrants that have resulted in the seizure

1

of illegal drugs and evidence of drug violations. I have executed seizure warrants that have resulted in the seizure of assets acquired with drug proceeds and assets utilized to facilitate drug activities.

3.      During my career in law enforcement, I have participated in investigations involving the illegal distribution of controlled substances, firearms and gang related acts of violence to include homicides, shootings, robberies and home invasions. I have coordinated controlled purchases of illegal drugs and firearms utilizing confidential sources and cooperating witnesses. I have written and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs, conducted electronic as well as physical surveillance of individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, and provided testimony in Federal and State Grand Jury proceedings. I have also interviewed admitted drug traffickers, drug users, gang members, informants and cooperating defendants, as well as local, state and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. I have supervised the activities of informants and cooperating witnesses who have provided information and assistance in the federal prosecution of drug offenders.

4.      This Affidavit is submitted in support of a search warrant for 494 Cypress Road, Newington, CT (**Target Premises 1**), which is a townhouse style condominium, with the numbers "494" posted to the left side of the front entry door; and a criminal complaint and arrest warrant for Lionel GARDNER, a.k.a. "Bleek," with a date of birth of xx-xx-1984, for unlawfully

possessing with the intent to distribute, and distributing, fentanyl and cocaine base ("crack cocaine") in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C).

5.      Because this affidavit is submitted for this limited purpose, I have not included each and every fact known to me regarding this investigation.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause to support the requested search and arrest warrants.

## II.  SUMMARY OF THE INVESTIGATION

6.      I, and other members of the NCVCGTF, have been investigating the criminal activities of Lionel GARDNER, a.k.a. "Bleek."  Based on the investigation to date, GARDNER distributes fentanyl and cocaine base ("crack cocaine") in Hartford and Newington, including in the areas of Albany Avenue, Main Street and Edgewood Street. The investigation has further revealed that GARDNER uses his residence at 494 Cypress Road, Newington, CT ("**Target Premises 1**") to process, package, store, and distribute fentanyl.  The investigation has also revealed that GARDNER resides at **Target Premises 1**. More particularly, GARDNER identified **Target Premises 1** as his address to the Newington Police Department on November 21, 2018, following his arrest by Newington Police at **Target Premises 1** for assorted charges to include operation of a drug factory, sale of narcotics, and criminal possession of firearms.  GARDNER was released on bond following his arrest and his case is pending in New Britain Superior Court.

7.      In July 2019, a Federal Bureau of Investigation ("FBI") Confidential Human Source (hereafter "CHS-1") began providing information about GARDNER.   CHS-1 has previously provided information to investigators which has led to the seizure of narcotics and arrests of narcotics traffickers.  Accordingly, I believe that CHS-1 is reliable.  CHS-1 stated that

GARDNER is trafficking large quantities of illegal narcotics.  CHS-1 further stated that s/he knew that GARDNER operates several rental vehicles in furtherance of his drug operation.  CHS-1 further stated that GARDNER's telephone number was (860) 797-5469 (the "Target Telephone"), that GARDNER resides at **Target Premises 1** with his girlfriend, and that GARDNER use **Target Premises 1** to package and store fentanyl.

8.      CHS-1 also advised that in the late afternoon hours, GARDNER and his girlfriend would drive around in their vehicle and meet drug customers in the North End of Hartford. CHS-1 advised that GARDNER's girlfriend would usually conceal the drugs on her persons.

**August 5, 2019 Controlled Purchase of Fentanyl from GARDNER**

9.      On August 5, 2019, CHS-1 conducted a controlled fentanyl purchase from GARDNER.  At approximately 10:32 a.m., CHS-1 was met at an undisclosed secure location by investigators.  Investigators searched CHS-1's person for any illegal items with negative results. At approximately 10:52 a.m., CHS-1 placed a recorded telephone call to GARDNER's wireless phone, (860) 797-5469. The call was on "speaker mode" and overheard by investigators. GARDNER answered the phone. CHS-1 advised GARDNER that s/he needed "two" (referring to 200 bags of fentanyl) and that s/he only had $460.  GARDNER told CHS-1 that he needed $500 and that GARDNER was only going to give CHS-1 eighteen of "them" (180 bags of fentanyl). Both agreed to meet at **Target Premises 1**.  Following the phone conversation, CHS-1 was provided a recording device (audio/visual) and $460 in FBI evidence funds for the purchase of fentanyl.

10.     At approximately 10:55 a.m., CHS-1 departed the secure location and drove to the area of **Target Premises 1**, while being followed by investigators. Prior to CHS-1 arriving,

investigators observed a dark colored Nissan Pathfinder and a blue Infiniti sedan parked in front of **Target Premises 1**. From prior dealings, investigators were aware that GARDNER operates both of the mentioned vehicles.  At approximately 10:57 a.m., investigators observed GARDNER exit through the front entry/exit door of **Target Premises 1** and walk towards CHS-1. GARDNER approached CHS-1 and handed him/her an unknown item. A short time later, investigators observed CHS-1 walking away from GARDNER. GARDNER was then observed entering **Target Premises 1**.  CHS-1 then traveled back to the secure location to meet with investigators.

11.    Upon meeting at the secure meeting the location, CHS-1 handed over a clear plastic bag which contained 30 blue wax paper sleeves and 150 white paper sleeves, all of which contained a white powder substance. Investigators searched CHS-1's person for any illegal items with negative results.  Investigators later conducted a field drug test on a small portion of white powder substance, which showed positive results for fentanyl. CHS-1 was interviewed and provided the following information.

12.    CHS-1 advised that as s/he walked towards GARDNER's residence, s/he called him on his wireless phone. GARDNER answered the phone. CHS-1 told GARDNER that s/he was close. Moments later, CHS-1 observed GARDNER walking towards him/her from the area of his residence. CHS-1 approached GARDNER and engaged him in a conversation. After a brief conversation, GARDNER handed CHS-1 a clear plastic bag containing numerous bags of packaged fentanyl. CHS-1 took the drugs and handed GARDNER the FBI evidence funds. Following the transaction, GARDNER informed CHS-1 that he had "crack" cocaine for sale at $150 for a "ball" (3.5 grams of cocaine). CHS-1 informed GARDNER that s/he will let him know later on about purchasing "crack" cocaine.

## August 8, 2019 Controlled Purchase of Fentanyl and Cocaine from GARDNER

13.     On August 8, 2019, CHS-1 conducted a controlled fentanyl and "crack" cocaine purchase from GARDNER.  At approximately 10:00 a.m., investigators arrived in the area of **Target Premises 1** and observed the same blue colored Infiniti sedan and Nissan Pathfinder parked directly in front. At approximately 10:16 a.m., investigators observed GARDNER exit through the front door of **Target Premises 1** and walk to the left of his residence. GARDNER then walked to the rear of the building.  At approximately 10:18 a.m., investigators observed a dark colored Chevrolet pickup truck with a single cab arriving, and meeting with GARNDER on the far left side of the building. A short time later, investigators observed the same pickup truck drive off. GARDNER was then observed entering **Target Premises 1** through the front door.

14.     At approximately 10:30 a.m., CHS-1 was met at an undisclosed secure location by investigators.  Investigators searched CHS-1's person and vehicle for any illegal items with negative results.  At approximately 10:37 a.m., CHS-1 placed a recorded telephone call to GARDNER's wireless phone, (860) 797-5469. The call was on "speaker mode" and overheard by investigators. GARDNER answered the phone. CHS-1 informed GARDNER that s/he wanted "two" (200 bags of fentanyl) and a "ball". CHS-1 informed GARDNER that s/he had "650" for everything. GARDNER informed CHS-1 that he needed $680 and that he wanted $180 for the "ball." GARDNER informed CHS-1 that he just "re-upped" and needed the money. Both then agreed to meet at **Target Premises 1**. Following the phone conversation, CHS-1 was provided a recording device (audio/visual) and $680 in FBI evidence funds for the purchase of fentanyl and "crack" cocaine.

15.     At approximately 10:40 a.m., CHS-1 left the secure location in his/her vehicle and

traveled to GARDNER's residence. At approximately 10:43 a.m., investigators observed CHS-1 arrive in the area of **Target Premises 1** and park his/her vehicle. At approximately 10:45 a.m., investigators observed GARDNER exit through the front door of **Target Premises 1** and meet with CHS-1. GARDNER and CHS-1 were observed walking towards the side of the building. At approximately 10:51 a.m., investigators observed CHS-1 enter his/her vehicle and moments later, drive off. At this point, GARDNER was observed entering **Target Premises 1** through the same front door, using a key to open the door. CHS-1 then traveled back to the secure meeting location.

16.     Upon meeting at the secure location, CHS-1 handed over the following: one knotted clear plastic sandwich bag containing approximately 200 yellow wax paper sleeves, each containing a white powder substance and one knotted clear plastic sandwich bag containing a white rock like substance. At the secure location, investigators searched CHS-1's person for any illegal items with negative results. Investigators later conducted a field drug test on a small portion of white powder substance which showed positive results for fentanyl. A field drug test on a small portion of the white rock like substance showed a positive reaction for cocaine. CHS-1 was interviewed and provided the following information.

17.     CHS-1 advised that s/he arrived in the area of GARDNER's residence and called him. GARDNER answered the phone and informed CHS-1 that he was coming out. Moments later, CHS-1 observed GARDNER exit from the front door of **Target Premises 1** and walk towards CHS-1's vehicle. At this point, CHS-1 exited his/her vehicle and walked with GARDNER towards the side of the building. GARDNER then handed CHS-1 numerous bags of packaged fentanyl and a small bag of "crack" cocaine. CHS-1 took the drugs and n handed GARDNER the FBI evidence funds. Following the transaction, CHS-1 informed GARDNER that the "crack"

cocaine looked small. GARDNER advised that his "stuff" was broken down into three grams, and that he normally charges $250 for an "eight ball." GARDNER then informed CHS-1 that he has been "bagging" up since the early morning hours. GARDNER went on to say that he had a customer coming over to purchase about 400 bags from him. Moments later, CHS-1 entered his/her vehicle and traveled back to the secure meeting location.

## III.    CONCLUSION

18.    During my tenure as a law enforcement officer, I have investigated and participated in numerous operations which involved, in part, drug trafficking violations, the flow of the illegal proceeds obtained from drug trafficking, and related offenses such as violations of firearms laws. My involvement in these investigations has resulted in the successful prosecution of numerous individuals and the forfeiture of assets purchased with the proceeds from unlawful drug trafficking, as well as assets used to facilitate these violations.  Search warrants relating to these investigations have covered vehicles, residences of drug traffickers and their co-conspirators, "stash houses" used as storage and distribution points for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking.

19.    Materials searched for and recovered in these locations have included various controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, records reflecting the names, addresses, and telephone numbers of co-conspirators, sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; wireless telephones, paging devices, computers and computer disks, answering machines; and

various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking. These items obtained by search warrants, constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

20.    Based on my training, experience, and participation in this and other drug trafficking investigations, I know that:

    a.  drug traffickers often place assets in the names other than their own to avoid detection of these assets by law enforcement;

    b.  drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

    c.  even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

    d.  drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug business;

    e.  drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

    f.  drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore the above mentioned books, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

g.  drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of drug associates within their residences, for ready access and to conceal them from law enforcement agencies;

h.  drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates;

i.  drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions.  However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of drug record to assist the trafficker in the collection of drug debts;

j.  drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

k.  drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

l.  drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

m.  persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

n.  drug traffickers often have photographs or videos of themselves, their co-conspirators, and the property and assets purchased with drug proceeds. These photographs and videos are normally in the drug traffickers possession or residence;

o.   the State of Connecticut is generally viewed as a consumer state in regards to narcotic activity.  However, it is common for drug traffickers to travel to major distribution centers such as New York to purchase their narcotics for distribution.  It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers.  It is known that drug traffickers' methods include, but are not limited to: commercial airlines, private motor vehicles, tractor trailer units, public transportation, and motor vehicles with concealed compartments, and government and contract mail carriers.  It is known that the residences of drug traffickers will often contain records of drug related travel.  These records may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

p.   based on my training and experience, drug traffickers commonly have firearms, ammunition and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to handguns, rifles, shotguns,  automatic weapons, knives, ammunition, and magazines. These firearms and weapons are most often kept to protect and secure drug traffickers' property;

q.   based on my training, experience and participation in this and other drug trafficking investigations, I know that it is generally a common practice for drug traffickers to store their drug inventory and drug related paraphernalia in their residences, cars or those of trusted associates.  This paraphernalia frequently includes scales, funnels, sifters, grinders, plastic bags, heat sealing devices, and dilutant;

r.   based on my training and experience, drug dealers often create secret locations, commonly called "traps" or "hides" in their automobiles and residences.  Often, drug dealers will use these traps or hides to conceal and store narcotics, weapons, money and other items and documents related to their drug trade; and

s.   based on my training, experience and participation in this and other drug trafficking investigations, I know that drug traffickers often possess, maintain and control other items related to their drug trafficking activities, as described in Attachment A to this affidavit, in their cars, homes, garages and out-buildings.

21.    On the basis of the foregoing information, there is probable cause to believe, and I

do believe, that Lionel GARDNER, a.k.a. "Bleek," unlawfully possessed with intent to distribute,

11

and did distribute, a mixture and substance containing a detectable amount of fentanyl and cocaine base ("crack cocaine"), in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

22.     Moreover, there is probable cause to believe that fruits, instrumentalities and evidence of these crimes will be found at: 494 Cypress Road, Newington, Connecticut (**Target Premises 1**).

23.     Because this is an application that pertains to an ongoing criminal investigation, and because disclosure of the information contained herein as well as disclosure of the warrants and complaint being requested herein may compromise the investigation and increase the risk of harm for the law enforcement officers responsible for conducting the arrest and search, or cause the target of the investigation to destroy or conceal evidence of criminal activity, or to flee and avoid apprehension, I request that the warrants, applications, complaint and this affidavit be ordered sealed by the Court, until further order of the Court.

Jeffrey Moody
Task Force Officer
Federal Bureau of Investigation

Subscribed and Sworn to before me
this 13th day of August, 2019.

/s/ Robert A. Richardson
ROBERT A. RICHARDSON
UNITED STATES MAGISTRATE JUDGE